**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KUNLE ADE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **NO.  09-1071** |
| **KIDSPEACE CORPORATION,** | : | |
| **Defendant.** | : | |
| | : | |

**DuBOIS, J.**                                                                          **March 10, 2010**

**M E M O R A N D U M**

**I.      INTRODUCTION**

This case arises out of plaintiff Kunle Ade's termination in December 2007 from his position as a child care counselor with defendant KidsPeace Corporation ("KidsPeace").  Plaintiff asserted the following claims in his First Amended Complaint: (1) race and national origin discrimination under Title VII of the Civil Rights Act of 1964 and 1991, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"), and 42 U.S.C. § 1981   (Counts I, II, and IV, respectively); (2) retaliatory termination under 42 U.S.C. § 1981 (Count V); and common law wrongful termination and breach of implied contract (Count III).  This Court has jurisdiction over plaintiff's Title VII and Section 1981 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.

Presently before the Court is defendant's Motion for Summary Judgment.  For the reasons that follow, defendant's Motion for Summary Judgment is granted.

## II.    BACKGROUND[1]

Defendant KidsPeace Corporation ("KidsPeace") is a private charity that runs a psychiatric hospital, residential treatment programs, educational services, and community-based programs which serve the behavioral and mental health needs of children and adolescents. (Defendant's Statement of Undisputed Material Facts ¶¶ 1, 2; Plaintiff's Statement of Disputed Facts ¶¶ 1-2) (hereinafter, "Def.'s Stmt." and "Pl.'s Stmt.")  As part of its program, KidsPeace runs several homes located in Lehigh Valley, Pennsylvania, which house adolescents with behavioral and emotional difficulties. (Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 3.)

Plaintiff Kunle Ade is an African-American male, born in Liberia, West Africa. (Def.'s Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.)  On January 15, 2006, Ade was hired by KidsPeace to work as a late night child care counselor at the Patriot Center, a collection of residential homes in Orefield, Lehigh County. (Def.'s Stmt. ¶¶ 4,6; Pl.'s Stmt. ¶¶ 4,6.)  In general, late night counselors are tasked with providing security and support for residential clients during overnight hours.  (Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 5.)  In April 2006, plaintiff also began working as a part-time member of the therapeutic support staff at the Patriot Center.  (Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9.)

At the time of his hire, KidsPeace provided Ade with an employee handbook.  (Def.'s Stmt. ¶¶ 10-11; Pl.'s Stmt. ¶ 10-11.)  Ade signed several acknowledgment forms attesting to his receipt of the handbook.  (Def.'s Mot. Exs. D, E.)  In its introductory section, the handbook states, in pertinent part, "[This handbook] is not intended to be a contract of employment or a complete statement of KidsPeace policies and procedures... No information contained in this handbook, in any

---

[1] The facts are presented in the light most favorable to plaintiff.  Disputed facts are noted as such.  Where appropriate, plaintiff's and defendant's statements of material facts are cited in lieu of a direct citation to the record.

policy and procedure manual, or in any employment interview constitutes an expressed or implied contract of employment." (Def.'s Mot. Ex. F; Pl.'s Trial Ex. 25.) The handbook goes on to set forth various KidsPeace policies regarding vacation and personal days, other employee benefits, and standards of conduct for employees. (Def.'s Mot. Ex. F; Pl.'s Trial Ex. 25.) The handbook and separate KidsPeace Harassment Policy provide that allegations of harassment will be "investigated promptly," and that misconduct, as defined by the policy, may result in disciplinary action, including immediate termination of employment. (Def.'s Mot. Exs. F, G; Pl.'s Trial Ex. 25.) According to the Harassment Policy, investigations "may include individual interviews with the parties involved, and where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge." (Def.'s Mot. Ex. G.)

Ade was initially assigned to work under Jane Marino, a Supervisor at KidsPeace, and Donna Doran, an Assistant Supervisor. (Def.'s Stmt. ¶¶ 18, 20; Pl.'s Stmt. ¶¶ 18, 20.) On or about Ade's third day of work in January 2006, Marino introduced Ade to Pam Peters. (Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19; Ade Dep. 67-69.) Peters was a fellow late night child care counselor, and never had supervisory authority over Ade during his tenure at KidsPeace. (Def.'s Stmt. ¶ 20; Pl.'s Stmt. ¶ 20.) When Peters first met Ade, in the presence of Marino and Doran, Peters stated in substance to Ade, "Is it true that you're from Africa? You don't have the typical African accent. Is it really true that you people from Africa wear leaves?" (Pl.'s Stmt. ¶ 97-98; Ade Dep. 68.) Ade complained about the comment to Marino shortly after the incident, and again several months later in casual conversation. (Ade Dep. 69-72, 76-79, 87-88.) Ade also mentioned the Peters comment within several months to Doran and in late 2006 to Scott Pompa, the late night Manager for Residential Programs at KidsPeace. (Ade Dep. 73-75, 102-105.) On each of these occasions, Ade brought up

the comment as part of a conversation focused on a different topic. (Ade Dep. 73-75, 102-105.) Ade made no formal complaint about Peters's comment, and Peters was never disciplined. (Ade Dep. 70-71; Pl.'s Stmt. ¶ 99.)

On October 2, 2006, Ade was given a verbal warning for violating KidsPeace attendance policy. (Ade Dep. 155; Def. Mot. Ex. I.) Several weeks later, on October 25, 2006, Jane Marino and Donna Doran issued a written warning to Ade regarding attendance issues. (Ade Dep. 157; Marino Dep. 32; Def. Mot. Ex. I.) The October 25, 2006 warning alleged that Ade was absent on Friday, October 20, 2006, left at 4:30 am on Sunday, October 22, 2006, and that he "called off" on Monday, October, 23, 2006. (Def. Mot. Ex. I.) The written warning stated that "[a]ny further occurrances [sic] may result in further disciplinary action up to and including termination." (Def. Mot. Ex. I.) Ade refused to sign the warning when it was presented to him on October 25, 2006, and subsequently spoke to Scott Pompa about his leave situation. (Ade Dep. 156, 158-159; Pompa Dep. 22-33.)[2] However, although the written warning remained unsigned by Ade, it was not removed from Ade's personnel file after the meeting with Pompa. (Ade Dep. 157.)

In December 2006, Ade filled out a KidsPeace employment survey. In that survey, Ade stated, in pertinent part:

Q: What do you like least about your current position and why?
A: Things are not being addressed accordingly. Well, people are being biased and

---

[2] In his deposition testimony, Ade states that he specifically discussed the October 26, 2006 disciplinary action with Pompa during the meeting. (Ade Dep. 158.) Ade further states that he received prior approval from Marino to miss work on October 23, 2006, as his girlfriend went into false labor that day and had to been seen at the hospital, and that he communicated this information to Pompa. (Ade Dep. 156-158.) Ade maintains that Pompa told him to "disregard" the written warning. (Ade Dep. 158.) However, Pompa states in his deposition testimony that he and Ade only discussed leave issues, and did not speak about the disciplinary action. (Pompa Dep. 28-29.)

others feel unwanted;

Q: What suggestions for improvement do you have?

A: Well, management need [sic] to address things very vividly across the board and not being [sic] biased;

Q: What type of things occur in other companies that we could implement here at KidsPeace to improve retention and the work environment?

A: Well, there are lot of things that could be said but words are inadequate to expressed [sic]. For retention: stop the gossip and the spying on others. Work environment: staff should stop feeding the stray cats. Supervisors should stop condoning these act [sic];

Q: Any additional feedback/comments?

A: These things need to be addressed as soon as possible. It is very certain that most employee [sic] feels [sic] this way and share the same views.

(Def.'s Mot. Ex. KK; Pl.'s Trial Ex. 12.)

On January 3, 2007, a co-worker of Ade, Kara Williams, complained to her supervisor at KidsPeace that Ade made inappropriate comments to her about her breasts. (Williams Dep. 12, 21.) According to Williams, Ade pointed to her breasts and stated, "What would you do if I touched those?" (Williams Dep. 12.) The parties contest whether Ade was interviewed and/or counseled after the incident and whether the allegations were truthful,[3] but it is undisputed that the cases Ade shared with Williams were reassigned, and that he no longer worked together with Williams after January 2007. (Def.'s Mot. Ex. K; Ade Dep. 163-168.) No formal disciplinary action was taken against Ade, and no formal report relating to the alleged incident was placed in his employment file. (Def.'s Mot. Ex. K; Remmel Dep. 55-60.)

---

[3] An email between KidsPeace management staff documents a January 5, 2007 meeting with Ade, an Assistant Director, and a member of the Human Resources Department, in which the alleged incident was discussed with Ade. (Def.'s Mot. Ex. K.) In the email, it is alleged that Ade admitted to making an inappropriate comment about Williams's breasts, but claimed that his relationship with Williams was "flirtatious." (Def.'s Mot. Ex. K.) The email states that all cases shared by Williams and Ade were reassigned, and that Williams's schedule was changed to limit contact with Ade. (Def.'s Mot. Ex. K.) In his deposition testimony, Ade denies the incident with Williams in its entirety, and denies ever having met with KidsPeace staff or admitting that he made any inappropriate comment to Williams. (Ade Dep. 163-168.)

On March 1, 2007, Peters complained about Ade to KidsPeace management, alleging that Ade intentionally opened a desk drawer into her stomach. (Def.'s Stmt. ¶¶ 33-34; Doran Dep. 42-44.) Ade's supervisors, Lea Nissley and Donna Doran, met with both Ade and Peters, and discussed the allegations with each of them. (Def.'s Stmt. ¶ 37; Pl.'s Stmt. ¶ 37.) Amy Remmel, an administrator in KidsPeace's Human Resources Department ("HR"), also met with Peters. (Def.'s Stmt. ¶ 38; Pl.'s Stmt. ¶ 38.) KidsPeace management did not credit Peters's allegations, and Ade was not disciplined or counseled in relation to the complaint. (Remmel Dep. 43-44; Pompa Dep. 38-39; Doran Dep. 110-111.) However, subsequent to the complaint, Peters and Ade were no longer scheduled to work together. (Def.'s Stmt. ¶ 42; Pl.'s Stmt. ¶ 42.)

On March 22, 2007, Ade and Jeanine Martincavage were working together as late night counselors at one of the KidsPeace homes, the Revere House. (Def.'s Stmt. ¶ 43; Pl.'s Stmt. ¶ 43.) In the early morning hours, Martincavage called her supervisor Lea Nissley to complain about Ade's behavior. (Def.'s Stmt. ¶ 44-45; Pl.'s Stmt. ¶ 44-45.) Nissley immediately responded to the Revere House, where she observed that Martincavage appeared to be upset. (Def.'s Stmt. ¶ 45-46; Pl.'s Stmt. ¶ 45-46.) Martincavage told Nissley that Ade became angry when she prepared a bowl of milk for a stray cat. (Def.'s Mot. Ex. Q – Nissley Affidavit ¶ 7 (hereinafter "Nissley Aff."); Martincavage Dep. 23-25.) Martincavage further reported that Ade cursed repeatedly and threatened to kick the cat, and that when she attempted to block the door to stop Ade from harming the cat, Ade shoved her into a wall and exited the house.[4] (Nissley Aff. ¶ 7; Martincavage Dep. 24.) Nissley spoke to

_____

[4] Ade disputes the version of events alleged by Martincavage, contending instead that Martincavage pushed him before he pushed her. (Ade Dep. 187-188.) In addition, Ade maintains that the feeding of stray cats by Martincavage and other employees at the Patriot Center was specifically prohibited by KidsPeace corporate office. (Ade Dep. 186.)

both Ade and Martincavage about the incident that night. (Nissley Aff. ¶ 7; Martincavage Dep. 25.) During a subsequent investigation, conducted by Nissley and Doran, both Ade and Martincavage gave additional statements. (Def.'s Mot. Ex. A – Remmel Affidavit ¶ 11 (hereinafter "Remmel Aff.")) Amy Remmel in HR also spoke with Martincavage separately. (Def.'s Stmt. ¶ 62; Pl.'s Stmt. ¶ 62.)

After interviewing the parties, Doran and Remmel concluded that Martincavage's version of events was more credible, and determined that Ade's actions violated KidsPeace policy. (Nissley Aff. ¶ 7; Def.'s Mot. Ex. II – Doran Affidavit ¶ 7 (hereinafter "Doran Aff.")) Ade was not terminated at that time, but was instead issued a final written warning, which he refused to sign. (Def.'s Stmt. ¶ 67-68; Pl.'s Stmt. ¶ 67-68; Ade Dep. 196-197; Def.'s Mot. Ex. U.) On April 4, 2007, three days after receiving the warning, Ade provided Doran with a letter in which he stated his feeling that KidsPeace's decision was "unfair and bias [sic]." (Def.'s Mot. Ex. V.) Specifically, Ade stated in his letter to Doran that "since this incident that occurred on March 22, 07 was all about the cats, I believed that was the reason I was treated unfaired [sic]." (Def.'s Mot. Ex. V.) Approximately one week after submitting the letter, Ade had a conversation with Doran during which he complained to Doran that he had been discriminated against on the basis of his race in relation to the Martincavage incident. (Ade Dep. 218-219; Pl.'s Resp. Ex. P – Ade Affidavit ¶ 3 (hereinafter "Ade Aff."))

In approximately May or June of 2007, Ade was eating lunch with a Syrian co-worker named Rheem. (Ade Dep. 112-114.) By this time, Donna Doran had been promoted from her role of Assistant Supervisor to the position of Supervisor. (Ade Dep. 112-113.) Doran entered the room where Ade and Rheem were having lunch, looked at the Syrian dish sitting on the table, and stated

in substance: "I wouldn't eat that. That looks like a turd.... You guys eat stuff like that in Africa?" (Ade Dep. 113.) Ade conveyed the comment to Amy Remmel in HR when he went to her office for the purpose renewing his ID, sometime within two months of the incident. (Ade Dep. 115-116.) Remmel instructed Ade to discuss the comment with her boss Scott Pompa, if he wanted to pursue a complaint. (Ade Dep. 116.) After this conversation, Ade never discussed the comment with Pompa, never informed anyone else at KidsPeace about the comment, and never made a formal complaint. (Ade Dep. 117.)

On November 25, 2007, Ade worked a night shift with Amanda Warner, another late night child care counselor at KidsPeace (Def.'s Stmt. ¶ 74; Pl.'s Stmt. ¶ 74; Warner Dep. 6.) Three days later, on November 28, 2007, Warner made a report concerning that evening to Doran. (Doran Dep. 53.) Warner informed Doran that during the November 25 shift, Ade forced himself on top of Warner, touched her breasts, and tried to kiss her as she was sitting on a couch. (Warner Dep. 27-28, 47; Doran Dep. 53-54.) She further stated that when she told him to stop and raised her voice, Ade covered her mouth with his hand. (Warner Dep. 27-28, 47.) Later that day, Warner prepared a typewritten account of the incident, which she provided to Doran. (Doran Dep. 63; Def.'s Mot. Ex. X.) Doran notified Nissley and Pompa about the incident, and Pompa directed Doran to speak with Ade about it. (Doran Dep. 65-66.)

On the same day of Warner's report, Doran and Nissley met with Ade. (Doran Dep. 65-68; Ade Dep. 123.) Doran and Nissley informed Ade of the complaint made by Warner, and communicated to him Warner's account of the incident. (Doran Dep. 67-68; Ade Dep. 123-124.) The written account provided by Warner was not shown to Ade. (Doran Dep. 64; Ade Dep. 143-144.) When Doran spoke with Ade about the incident, he completely denied the allegations,

asserting that nothing had happened and that Warner's statement was false.[5] (Doran Dep. 67-68; Ade Dep. 123-126.) Ade also stated to Doran that he felt she was inappropriately drawing conclusions based on Warner's statement, because he was "black," "male," and had an "issue with the cat situation." (Ade Dep. 124-125.) Doran then told Ade that further investigation would be conducted, and that someone from KidsPeace would be in touch with him. (Doran Dep. 68, 70; Ade Dep. 124.) The meeting between Ade and Doran and Nissley lasted approximately 10-15 minutes. (Doran Dep. 68-69.) Based on the alleged incident, Doran contacted Ade later on November 28, 2007 and notified him that he was being placed on administrative leave. (Doran Aff. ¶ 11; Remmel Dep. 92-93; Ade Dep. 127-128.)

Ade was not asked at any time to provide a written account of the evening. (Pompa Dep. 51-53.) However, sometime between December 2 and December 3, 2007, Ade hand-delivered a letter regarding the incident to Amy Remmel in HR. (Remmel Dep. 31-34; Remmel Aff. ¶ 16, Ade Dep. 129; Ade Aff. ¶ 26.) At that time, Ade had not yet been terminated. (Remmel Dep. 36-37; Ade Dep. 129.) The letter stated, in pertinent part: "I will [sic] like you to know that those accusation [sic] are false. It's a fallacy, and it lacks the nature of truth and has a recipe of chaos... This alleged accusation is defaming my character and I would like to clear my name. Thanks, your response is highly appreciated." (Pl.'s Trial Ex. 32.) Remmel did not question Ade about the November 25 incident when Ade dropped off the letter, and Ade did not volunteer any additional information or explanation in relation to Warner's allegations. (Remmel Dep. 34-35; Remmel Aff. ¶ 16; Ade Aff. ¶ 28.) However, Ade did complain to Remmel that "some of the female employees and female

---

[5] Ade denies Warner's allegations in his deposition testimony as well, and offers a different account of his interaction with Warner on the night of November 25, 2007. (Ade Dep. 134-143.)

supervisors at KidsPeace were discriminating against [him] because of [his] race and gender."[6] (Ade. Aff. ¶ 27.)

On December 5, 2007, Doran called Ade and left a voice message in which she informed him that KidsPeace had terminated his employment.[7] (Remmel Dep. 94-95; Def.'s Mot. Ex. BB.) Ade's termination was memorialized by an Employee Disciplinary Report, signed by several high-level employees at KidsPeace, including the Director of HR. (Def.'s Mot. Ex. BB.) That report was accompanied by paperwork documenting the meetings with both Warner and Ade on November 28, 2007, Warner's typewritten statement describing the November 25 incident, and a memo from Pompa to the Director of HR recommending Ade's termination "[d]ue to the nature of the most recent allegation and Mr. Ade's involvements [sic] in progressive disciplinary action(s)." (Def.'s Mot. Exs. X, Y, Z, AA.) Ade served and presumably filed a dual PHRA/EEOC Complaint on March 14, 2008, several months after his discharge, alleging that he has wrongfully terminated based on his race and ancestry.[8] (Pl.'s Trial Ex. 45.)

---

[6] Defendant correctly points out that plaintiff makes this allegation for the first time in an affidavit filed with his response to defendant's motion for summary judgment, having not testified about the conversation with Remmel despite being given numerous opportunities to do so during his deposition. The Court, however, will not apply the sham affidavit doctrine to disregard the allegation, as it does not contradict any statement made by plaintiff during his deposition. See Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 251-55 (3d Cir. 2007).

[7] Affidavits from Remmel, Nissley, and Doran state that Ade was informed of his termination on December 4, 2007 via telephone. (Remmel Aff. ¶ 17; Nissley Aff. ¶ 12; Doran Aff. ¶ 12.) However, Doran's telephone message to Ade discussing his termination was dated December 5 at 5:03 pm. (Remmel Dep. 94-95.) In addition, plaintiff's termination notice is dated December 5, 2007, and contained a notation that a message was left for plaintiff on December 5, 2007. (Def.'s Mot. Ex. BB.)

[8] The PHRA/EEOC Complaint was signed on January 15, 2008; the attached Certificate of Service states that the Complaint was served on KidsPeace on March 14, 2008. (Pl.'s Trial Ex. 45.) The record before the Court does not include the date the Complaint was filed.

In addition to those facts specific to Ade's employment, plaintiff offers the following evidence of defendant's varying treatment of other KidsPeace employees.

During Ade's employment at KidsPeace, Jeff Onuscho, a white male, was also employed by KidsPeace as a late-night child care counselor. (Def.'s Stmt. ¶ 88; Pl.'s Stmt. ¶ 88.) Like Ade, Onuscho worked under the supervision of Jane Marino. (Onuscho Dep. 20.) Several women who worked at KidsPeace with Onuscho complained about sexually inappropriate comments that Onuscho made to them or in their presence. (Marino Dep. 9-21; Burns Dep. 15-17.) On three separate occasions, Onuscho was verbally counseled for such conduct. (Marino Dep. 14-16; Onuscho Dep. 20-27.) Benjamin Arnold, the spouse of another female employee, claims that he discovered sexually explicit email messages from Onuscho to his wife in her personal MySpace account, and that he reported these email messages to KidsPeace staff. (B. Arnold Dep. 6-13.)[9] No official disciplinary action was taken against Onuscho, and he was not terminated based on the above-described conduct. (Marino Dep. 14, 21; Onuscho Dep. 23.)

Sometime between June 2008 and her departure from KidsPeace in May 2009, Kathleen Somers, another late-night child care counselor, became aware that fund-slashing – theft of funds meant for the children/clients' use at Kidspeace – was taking place. (Somers Dep. 17, 23-24, 28.) Somers came to suspect her white supervisor, Sean McPeek, as the thief, since he was the "only... person that had control of the money."[10] (Somers Dep. 35.) Somers reported her suspicions to

---

[9] Kimberley Fleming-Arnold, Benjamin Arnold's wife, states that Onuscho sent her a naked photograph of himself to her cellular telephone. (Fleming-Arnold Dep. 18.) However, Fleming-Arnold admittedly never complained to anyone at KidsPeace about the incident. (Fleming-Arnold Dep. 19.)

[10] In her deposition testimony, Somers states in a general way that other white subordinates were involved in the fund-slashing scheme, insofar as they provided McPeek with

McPeek, who in return gave her the "runaround." (Somers Dep. 36.) Somers made no complaint to any employee above McPeek, including McPeek's supervisors, or to HR. (Somers Dep. 36, 56-57.) Somers mentioned her suspicions to a co-worker, Jamie Jacobs, who had no authority to discipline McPeek. (Somers Dep. 31-32.) Somers is not aware of any complaint by Jacobs concerning McPeek. (Somers Dep. 32.) Somers also informed a former supervisor about problems in her unit, but there is no evidence that she provided detailed allegations or even identified McPeek as the culprit. (Somers Dep. 24-25.) During the course of Somers's employment, McPeek was never counseled or disciplined by KidsPeace for the alleged theft. (Somers Dep. 57.)

Sherwood Dejoie, an African-American male, also worked at KidsPeace during Ade's employment. (Ade Dep. 221-222.) Donna Doran personally observed Dejoie sleeping on the job three or four times, and also received approximately two reports from other employees that discovered Dejoie sleeping while on duty. (Doran Dep. 48-49.) Dejoie was ultimately terminated after being caught sleeping while monitoring a child on suicide level. (Ade Dep. 226-227.) Using his cellular telephone, Ade took photographs of several KidsPeace employees who were allegedly sleeping at work, including Dejoie, Nissley, Peters, and Onuscho.[11] (Ade Dep. 222-225; Pl.'s Trial Exs. 33-38.) Although Ade did not report these employees immediately, he claims that he eventually informed Doran of the problem, and displayed the photos to Doran. (Ade Dep. 222-225.) Doran

---

valid receipts to assist McPeek in covering up the theft. (Somers Dep. 41-43.) Somers identifies only one of these individuals by name – Craig Batman – and does not allege that she made reports to anyone else at KidsPeace concerning their purported misconduct. (Somers Dep. 54-59.)

[11] The photographs, provided to the Court among plaintiff's trial exhibits, are largely dark and blurry, making it difficult to determine whether the pictured employees' eyes are closed, let alone whether they are in fact sleeping. (Pl.'s Trial Exs. 33-38.)

denies ever having spoken to Ade about the issue, or having seen any of the photos.  (Doran Dep. 49-50.)  Aside from Dejoie, none of the other employees were disciplined for sleeping on the job. (Doran Dep. 51.)

## III.  STANDARD OF REVIEW

A court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is material when it "might affect the outcome of the suit under the governing law."  Id.  In considering a motion for summary judgment, the "facts must be viewed in the light most favorable to the party opposing summary judgment."  Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

## IV.  DISCUSSION

### A.  Counts I, II, and IV: Race and National Origin Discrimination

Under Title VII of the Civil Rights Act, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual... because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1); Whitmire v. Kvaerner Philadelphia Shipyard, 340 F. App'x 94, 97 (3d Cir. 2009).  The framework for evaluating summary judgment motions under Title

VII was established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802

(1973). The Supreme Court further explained the framework in <u>Texas Dep't of Cmty. Affairs v.

Burdine</u>, 450 U.S. 248, 252 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

<u>Id.</u> (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802) (citations omitted).[12] Notwithstanding this burden

shifting framework, at all times, the ultimate burden of persuading the trier of fact that defendant

intentionally discriminated against plaintiff remains with plaintiff. <u>Sarullo v. U.S. Postal Serv.</u>, 352

F.3d 789, 799 n.10 (3d Cir. 2003); <u>Burdine</u>, 450 U.S. at 253. Section 1981 and PHRA claims

alleging race and national origin discrimination are analyzed pursuant to the same standard as Title

VII claims. <u>See, e.g.</u>, <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 410 (3d Cir. 1999); <u>Manning

v. Temple Univ.</u>, 157 F. App'x 509, 513 (3d Cir. 2005).

### 1.    Plaintiff's Prima Facie Case of Discrimination

Under the <u>McDonnell Douglas</u> framework, plaintiff first has the burden of proving by a

preponderance of the evidence a prima facie case of discrimination. <u>Id.</u> In the context of a challenge

to an adverse employment action, plaintiff's prima facie case requires evidence that: (1) plaintiff is

a member of a protected class; (2) plaintiff was qualified for his position; (3) plaintiff suffered an

---

[12] The parties have briefed this case as a pretext case, and not as a "mixed motives" case. Accordingly, the Court will decide the summary judgment motion under the <u>McDonnell Douglas</u> burden shifting framework applicable to pretext cases. <u>See</u> <u>Verney v. Pennsylvania Tpk. Comm'n</u>, 903 F. Supp. 826, 829 (M.D. Pa. 1995); <u>Brewer v. Quaker State Oil Refining Corp.</u>, 874 F. Supp. 672, 681 n.4 (W.D. Pa. 1995), <u>rev'd on other grounds</u>, 72 F.3d 326 (3d Cir. 1995).

adverse employment action; and (4) the circumstances of his discharge permit an inference of unlawful discrimination, such as might occur when the position is filled by a person not of the protected class. Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995). Plaintiff may demonstrate the fourth element of the prima facie case by showing that his employer treated a similarly-situated employee who is not within the protected class differently than him, or by presenting other evidence that would give rise to an inference of unlawful discrimination against him. Cange v. Philadelphia Parking Auth., No. 08-3480, 2009 WL 3540784, at *6 (E.D. Pa. Oct. 30, 2009); see also Sarullo, 352 F.3d at 798 (plaintiff must "establish some causal nexus between his membership in a protected class" and the adverse employment decision).

For purposes of the summary judgment motion, it is undisputed that plaintiff has satisfied the first three elements of his prima facie case: he is a member of a protected class, was qualified for his position, and suffered an adverse employment action. (Def.'s Mot. 15; Pl.'s Resp. 37-38.) However, defendant contends that plaintiff has failed to establish the fourth element of his prima facie case – namely, that the circumstances of his discharge do not permit an inference of unlawful discrimination. (Def.'s Mot. 15.) Specifically, defendant argues that there is no basis for inferring discriminatory animus because: (1) plaintiff cannot demonstrate that he was treated less favorably than any similarly situated, non-minority employees, and (2) stray remarks made by two KidsPeace employees well in advance of plaintiff's termination do not amount to circumstances giving rise to an inference of unlawful discrimination. (Def.'s Mot. 15-27.)

However, the Court need not decide whether plaintiff has established the fourth element of his prima facie case. Assuming *arguendo* that plaintiff establishes the fourth element and makes out a prima facie case, plaintiff's claim fails under the third step of the McDonnell Douglas burden

shifting framework.  In short, plaintiff has presented insufficient evidence to permit a reasonable jury to conclude that defendant's proffered reason for terminating plaintiff was pretextual.

### 2.  Defendant's Legitimate, Non-Discriminatory Reason for Termination

In the second step of the <u>McDonnell Douglas</u> framework, the defendant has the burden of producing a legitimate, non-discriminatory explanation for its decision to terminate plaintiff. <u>McDonnell Douglas</u>, 411 U.S. at 802.  The Court concludes that KidsPeace has articulated such a reason in this case.  Specifically, KidsPeace based its decision to terminate plaintiff on a pattern of inappropriate conduct toward female co-workers, culminating in an alleged sexual assault of an employee shortly before his termination.  (Def.'s Mot. 29-30); <u>see</u> <u>Walters v. Washington County</u>, No. 06-1355, 2009 WL 793639, at *15 (W.D. Pa. March 23, 2009) (plaintiff's prior disciplinary history and violation of defendant's sexual harassment policy provides a legitimate nondiscriminatory reason for termination).

At this point, the burden shifts back to plaintiff to prove that the legitimate reason proffered by defendant was pretextual.  <u>McDonnell Douglas</u>, 411 U.S. at 804.

### 3.  Plaintiff's Evidence That Defendant's Reason for Termination Was Pretextual

Third Circuit precedent recognizes two theories under which plaintiff may establish that a defendant's articulated reason for termination was pretextual.  In order to prove pretext, a plaintiff can either: (1) present evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action," or (2) present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication."  <u>Akinson v.</u>

LaFayette Coll., 460 F.3d 447, 454 (3d Cir. 2006) (quoting Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994)).

### (a)     First Theory of Pretext

### (i)     Applicable Law

Under the first theory of pretext, a plaintiff may survive summary judgment by pointing to evidence in the record "from which a factfinder could reasonably... believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.  For example, a plaintiff may "show that the employer has previously discriminated against [him], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998).

When using comparators to establish pretext, plaintiff must show that the individuals engaged in the same conduct as him and that they shared in common all relevant aspects of his employment.  See Gazarov ex rel. Gazarov v. Diocese of Erie, 80 F. App'x 202, 206 (3d Cir. 2003) (noting that individuals are similarly situated only where they engaged in "the same conduct"); Red v. Potter, 211 F. App'x 82, 84 (3d Cir. 2006) (citing Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003) ("plaintiff must show that others similarly situated to him in all relevant respects were treated differently by the employer") and Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994) ("plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the... employees who he alleges were treated more favorably")); Morris v. G.E. Fin. Assurance Holdings, No. 00-3849, 2001 WL 1558039, at *6 (E.D. Pa. Dec. 3, 2001)

("individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it") (internal quotations omitted).

> ### (ii) Plaintiff's Evidence That Discrimination Was More Likely Than Not a Motivating or Determinative Cause for Termination

Plaintiff's evidence that a discriminatory reason was more likely than not a motivating or determinative cause of his discharge may be separated into four categories: (1) discriminatory statements made to plaintiff by two KidsPeace employees, (2) disparate treatment of plaintiff as compared to other white KidsPeace employees, (3) separate instances of discrimination against plaintiff by KidsPeace, and (4) race-based differences in the treatment of other KidsPeace employees. The Court will address each of these categories of evidence in turn.

First, the two discriminatory comments allegedly made to plaintiff by Pam Peters and Donna Doran were temporally remote and unrelated to his termination. Peters's comment was made nearly two years prior to plaintiff's termination. Moreover, since Peters never maintained any supervisory control over plaintiff, and played no role in the decision making process leading to plaintiff's termination, her remark is not entitled to any great weight. See Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d Cir. 1999) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."). And although Donna Doran was plaintiff's supervisor and was involved in the termination decision making process, her comment concerning the appearance of a piece of food, made approximately six months before his termination, also bore no direct relationship

to the adverse employment action taken against plaintiff. Therefore, Doran's remark, though it may have been insensitive, cannot serve as the basis for an inference that discriminatory animus was the cause of plaintiff's termination. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1112, (3d Cir. 1997) (single statement made by decision maker four to five months before termination and not directly related to termination process, insufficient to create inference of discrimination).

Second, plaintiff's proposed comparators engaged in vastly different conduct than that which led to plaintiff's termination. Plaintiff focuses heavily on Jeff Onuschco, a white male co-worker at KidsPeace who made sexually explicit comments to and in the presence of several female employees. While the record discloses several of such comments, there is no allegation that Onuscho ever inappropriately touched a female employee. Plaintiff, on the other hand, was reported not only for an inappropriate comment by Kara Williams, but later for a physical assault by Jeanine Martincavage and for sexual assault and harassment by Amanda Warner. As a result, the Court concludes that plaintiff and Onuscho are not similarly situated. See Anderson v. Haverford Coll., 868 F. Supp. 741, 745 (E.D. Pa. 1994) (plaintiff must establish that comparator's acts were of "comparable seriousness to his own infraction").

Comparisons to other white employees who fed cats in violation of an alleged KidsPeace policy, such as Martincavage and Peters, or slept on duty and were not disciplined, including Peters, Onuscho, and Lea Nissley, suffer the same infirmity; these acts are not of comparable seriousness to the assaults complained of by Martincavage and Warner against plaintiff. With respect to alleged perpetrators of theft who went undisciplined, including Sean McPeek, there is no evidence that any manager or HR employee at KidsPeace was made aware of their actions. Without knowledge of wrongdoing, management cannot be expected to take any disciplinary action. As a result, these

individuals also cannot be described as similarly situated to plaintiff. See Moussa v. Commonwealth of Pennsylvania Dept. of Public Welfare, 289 F. Supp. 2d 639, 652 (W.D. Pa. 2003) (employee who engages in similar conduct, but whose actions are not known to decision makers, cannot serve as comparator). Plaintiff's argument that he and Scott Pompa were treated differently with regard to personal leave allowances is unavailing. (Pl.'s Resp. 36-40.) Pompa was a Manager of Residential Programs, occupying an entirely different position at KidsPeace than plaintiff, and is therefore not similarly situated to plaintiff. See Pierce, 40 F.3d at 802. Finally, plaintiff's effort to compare himself to Jeanine Martincavage, insofar as they were treated differently by KidsPeace after their incident of March 22, 2007, is likewise unavailing. Defendant decided not to discipline Martincavage, a white female co-worker, following an investigation in which defendant concluded that plaintiff, and not Martincavage, had acted in violation of KidsPeace policies. Though plaintiff may challenge the decision making process that led to this determination,[13] he cannot point to Martincavage as a comparator under such circumstances.

Third, plaintiff's contention that KidsPeace discriminated against him by denying his requests for personal leave and scheduling him in KidsPeace facilities where stray cats gathered is unsubstantiated. Plaintiff complained to Donna Doran that he was allergic to cats, and did not wish to work at houses where cats were present, such as the Paul Revere House. (Ade Dep. 133.) Plaintiff was nonetheless scheduled to work at Paul Revere House, at least in part due to staffing issues. (Ade Dep. 133; Doran Aff. ¶ 9.) In addition, in October 2006, KidsPeace both denied plaintiff's request for a personal leave of absence, and issued him a written disciplinary warning for

_____

[13] Plaintiff's theory of pretext relating to defendant's decision making processes is addressed *supra*.

missing work over the course of several days, even though he had obtained prior approval from Jane Marino to be absent for one of the missed days. (Pl.'s Trial Ex. 10; Ade Dep. 155-157; Def. Mot. Ex. I.) However, plaintiff presents no evidence to suggest that either of these acts were motivated by a discriminatory animus on the part of KidsPeace. Plaintiff's conjecture that his workplace requests were denied on the basis of his race or national origin, and not for some other reason, is insufficient to establish past instances of discrimination by defendant against him.

Fourth, plaintiff's argument that KidsPeace treated employees differently depending on their racial background is not supported by the record. Plaintiff contends that white employees who slept at work were treated differently from an African-American employee who did so. Plaintiff provided photographs, which allegedly show several white employees sleeping, to his supervisor, who thereafter failed to discipline any of the employees. (Pl.'s Trial Exs. 33-38.) The same supervisor personally observed an African-American employee sleeping on the job several times, before he was ultimately terminated for such behavior. (Doran Dep. 48-49.) However, the photographs provided by plaintiff as part of the record are not conclusive as to whether any of those individuals pictured were in fact asleep. Certainly, they cannot substitute for live observations of a supervisor on site. Evidence that a supervisor took disciplinary action in response to personal observations of a sleeping employee, and none in response to photographs allegedly depicting sleeping persons, is not probative of differential treatment.

Even considered together under the "totality of the circumstances" approach of Andrews v. City of Philadelphia, 895 F.2d 1469, 1484-85 (3d Cir. 1990), the above-described evidence would not be sufficient to permit a factfinder to infer that discrimination was more likely than not a motivating or determinative cause of plaintiff's termination. The combination of two stray remarks

made over the course of two years, comparisons of plaintiff with non-minority employees who engaged in vastly different conduct, speculation about why his workplace requests were denied, and an unsupported argument that employees who slept on the job were subjected to disparate disciplinary treatment depending on their race, simply do not support any such inference.

### (b)    Second Theory of Pretext

### (i)    Applicable Law

To avoid summary judgment under the second theory of pretext, discussed *infra*, plaintiff may establish that the reason for his termination was pretextual by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably... disbelieve [defendant's] articulated legitimate reasons." Fuentes, 32 F.3d at 764. In doing so, plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting Fuentes, 32 F.3d at 765). Since the focus of the analysis is the question of whether "discriminatory animus" motivated the employer, it is insufficient to show that the employer's decision was "wrong or mistaken." Jones, 198 F.3d at 413; Coulton v. Univ. of Pennsylvania, 237 Fed. Appx. 741, 747 (3d Cir. 2007). Rather, to prove pretext, a plaintiff must demonstrate that "the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Jones, 198 F.3d at 413 (internal quotations omitted).

In ascertaining whether the employer harbored a discriminatory animus, the "validity of the initial complaint is not the central issue, because the ultimate falseness of the complaint proves nothing as to the employer, only as to the complaining employee." Marshall v. Midlantic Bank,

N.A., No. 96-4964, 1997 WL 805160, at *4 (E.D. Pa. Dec. 31, 1997) (quoting Waggoner v. Garland, 987 F.2d 1160, 1165 (5th Cir. 1993)). It is not the veracity of allegations made against plaintiff by other employees which is at issue, but "rather the integrity of [defendant's] decision-making process in terminating plaintiff." Cange, 2009 WL 3540784, at *12 (quoting Ahmed v. Lowe's Co., No. 06-4798, 2008 WL 2967061, at *5 (E.D. Pa. July 31, 2008)) (brackets in Cange); see also Jackson v. Bob Evans-Columbus, No. 2:04CV559, 2006 WL 3814099, at *8 (W.D. Pa. Dec. 22, 2006) ("so long as Defendant's investigation and determination was based on a reasonable good faith belief, the Court may not act as a super-personnel department over an employer's business judgment"); Cleary v. CBRL Group, No. 3:05CV02246, 2007 WL 2212846, at *7 (M.D. Pa. July 31, 2007); Walters, 2009 WL 793639, at *17. Thus, the Court must determine "whether the employer *reasonably believed* the employee's allegation and acted on it in *good faith*, or to the contrary, the employer did not actually believe the co-employee's allegation but instead used it as a pretext for an otherwise discriminatory dismissal." Marshall, 1997 WL 805160, at *4 (quoting Waggoner, 987 F.2d at 1165) (emphasis added). In making that determination, it important to note that "[a] mistaken but good faith disciplinary decision does not give rise to an inference of discrimination without some showing that the decision was based on plaintiff's race." Jackson, 2006 WL 3814099, at *8 (citing Kariotis v. Navistar Int'l Trans. Corp., 131 F.3d 672, 677 (7th Cir. 1997)).

### (ii)     No Genuine Issues of Material Fact

As an initial matter, plaintiff's denial of the facts of each alleged incident does not create genuine issues of material fact barring summary judgment. See Waggoner, 987 F.2d at 1166 ("To the extent that [plaintiff's] summary judgment evidence relates to his innocence of the sexual harassment charge, it is irrelevant."). While plaintiff disputes the *substance* of the complaints, he

does not – indeed cannot – dispute that complaints were actually made to KidsPeace management. Because the validity of the complaints is not the central issue, a denial of the content of the complaints cannot create a genuine issue of material fact. Marshall, 1997 WL 805160, at *4. Rather, the focus of the inquiry must be on defendant, and whether it acted reasonably and in good faith in response to the complaints, or instead used them as a pretext for discriminatory termination. Id.

### (iii) Plaintiff's Evidence Challenging Defendant's Proffered Legitimate Reason for Termination

The Court concludes that plaintiff has not presented evidence from which a factfinder could reasonably disbelieve defendant's articulated legitimate reason for plaintiff's discharge. KidsPeace maintained a policy of investigating reports of harassment and taking disciplinary action, up to and including termination, against employees violating the policy. The record reflects that KidsPeace was made aware of four separate incidents involving different female employees over the course of plaintiff's employment: (1) a complaint by Kara Williams that plaintiff made a sexually explicit remark to her; (2) a complaint by Pam Peters that plaintiff intentionally opened a desk drawer into her stomach; (3) a complaint by Jeanine Martincavage that plaintiff used abusive language toward her and pushed her into a wall; and (4) a complaint by Amanda Warner that plaintiff harassed and sexually assaulted her during a night shift. (Williams Dep. 21; Peters Dep. 55-58; Martincavage Dep. 32-34; Warner Dep. 46-51.)

In the context of the latter three complaints, KidsPeace took steps pursuant to its policy to investigate misconduct and determine what, if any, disciplinary action was required.[14] Following

---

[14] With regard to the first of the four complaints, it is undisputed that in January 2007, Kara Williams complained to KidsPeace management that plaintiff made a sexually

the Peters complaint, KidsPeace investigated the incident, found no wrong-doing on plaintiff's part, and did not take any disciplinary action against him. (Doran Dep. 110-111.) Upon Martincavage's complaint, KidsPeace again investigated the allegations, speaking to both parties several times in the process, and concluded that plaintiff had acted in violation of KidsPeace policies. (Nissley Aff. ¶ 7; Doran Aff. ¶ 7; Remmel Affidavit ¶ 11.) Plaintiff was subsequently issued a written warning, which stated that any further incident could lead to termination. (Ade Dep. 196-197; Def.'s Mot. Ex. U) After Warner's complaint, KidsPeace supervisors again spoke with both parties, made a finding that plaintiff had violated the organization's harassment policy, and ultimately terminated plaintiff's employment. (Remmel Aff. ¶ 15; Nissley Aff. ¶ 10-11; Doran Aff. ¶ 10-11.)

Plaintiff contends that an inference of discriminatory intent can be drawn from the superficial nature of the inquiry conducted after Warner's complaint. The record, however, does not support plaintiff's contention. After the initial complaint, Doran had a meeting with Warner in which Warner gave a detailed report of the alleged incident to Doran. (Doran Dep. 58-64.) KidsPeace later obtained a comprehensive type-written account of the incident from Warner. (Doran Dep. 63; Def.'s Mot. Ex. X.) Doran then spoke to her manager, Scott Pompa, who directed her to speak with

---

inappropriate comment to her. (Williams Dep. 12, 21.) It is also undisputed that, thereafter, cases plaintiff shared with Williams were reassigned and that plaintiff no longer worked together with Williams. (Def.'s Mot. Ex. K; Ade Dep. 163-168.) However, plaintiff denies the allegations underlying the Williams's complaint and does not recall meeting with any KidsPeace staff about the complaint. (Ade Dep. 163-168.) The Court, construing the facts in the light most favorable to plaintiff, must accept plaintiff's assertion that no investigation was conducted following the complaint. Nonetheless, defendant's knowledge that such a complaint was made bears upon whether KidsPeace reasonably believed and acted in good faith upon Warner's December 2007 complaint of harassment and sexual assault. Notwithstanding the fact that, according to plaintiff, an investigation was not completed, defendant was entitled to rely on its awareness of Williams's similar complaint in evaluating Warner's allegations and deciding to terminate plaintiff.

plaintiff. (Doran Dep. 65-66.) Although it is undisputed that Doran and Lea Nissley confronted plaintiff with Warner's allegations and that plaintiff denied them, plaintiff asserts that he was not given an opportunity to explain his side of the story. (Doran Dep. 67-68; Ade Dep. 123-124.) But plaintiff's own deposition testimony contradicts this assertion. Plaintiff's statement that Doran began the meeting by asking "is there something you would like to tell me happened?," demonstrates that the Doran and Nissley actively sought information from plaintiff about the incident. (Ade Dep. 123.) Furthermore, had plaintiff wished to expand upon his denial of Warner's allegations, the record shows that he had several opportunities to do so. Plaintiff submitted a letter to KidsPeace before he was terminated, but failed to offer any details about the incident besides stating, "I will [sic] like you to know that those accusation [sic] are false." (Pl.'s Trial Ex. 32.) When plaintiff dropped off the letter with Amy Remmel in HR on December 2 or December 3, 2007, he again did not provide any information concerning Warner's complaint. (Remmel Dep. 34-35; Remmel Aff. ¶ 16; Ade Aff. ¶ 28.)

While KidsPeace could have conducted a more rigorous interview of plaintiff, and obtained more than a simple denial of the allegations from him, its failure to do so does not lead to the conclusion that KidsPeace's articulated reason for terminating him was pretextual. Plaintiff, who bears the burden throughout the <u>McDonnell Douglas</u> burden shifting framework, has not presented any evidence whatsoever that KidsPeace knew or should have known that Warner's allegations were false, or made any showing that the decision was based on plaintiff's race or national origin. <u>See Cleary</u>, 2007 WL 2212846, at *7; <u>Jackson</u>, 2006 WL 3814099, at *8 (citing <u>Kariotis</u>, 131 F.3d at 677). Moreover, defendant's actions in response to previous complaints support a finding that its decision after the Warner complaint was not pretextual – had KidsPeace harbored discriminatory

animus toward plaintiff, surely it could have terminated him after the Martincavage complaint, or disciplined him after the Peters complaint. That KidsPeace took no disciplinary action against plaintiff in response to one complaint, and issued a final warning rather than firing him in response to another, contradicts any claim that KidsPeace acted unreasonably or in bad faith, or that the disciplinary process was only a pretext for discriminatory discharge.

In the context of several previous complaints disclosing problems between plaintiff and female co-workers, the Court concludes that KidsPeace acted reasonably and in good faith in relying on Warner's complaint and terminating plaintiff. Without evidence of bad faith or unreasonableness, plaintiff cannot establish that defendant's stated reason for discharging him was a pretext for unlawful discrimination. See Waggoner, 987 F.2d at 1165-66.

### 4. Conclusion: Counts I, II, and IV

Because the Court concludes that plaintiff cannot establish that the legitimate reason proffered by defendant for plaintiff's termination was pretextual, the Court grants defendant's Motion for Summary Judgment on Counts I, II, and IV, in which plaintiff asserts claims of race and national origin discrimination.

### B. Count V: Section 1981 Retaliation Claim

### 1. Legal Standard

Retaliation claims asserted under Section 1981 are also analyzed under the McDonnell Douglas burden shifting framework. See Gilbert v. Philadelphia Media Holdings LLC, 564 F. Supp. 2d 429, 439 (E.D. Pa. 2008). In order to establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection

between the his participation in the protected activity and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006). Protected activity may consist of "formal charges of discrimination as well as informal protests of discriminatory employment practices, including making complaints to management...." Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995) (internal quotations omitted). However, in order to constitute protected activity, a complaint "must be specific enough to notify management of the particular type of discrimination at issue." Sanchez v. SunGard Availability Servs., LP, No. 09-2713, 2010 WL 318366, at *4 (3d Cir. Jan. 28, 2010) (citing Barber, 68 F.3d at 702) (holding that plaintiff's report that he was being "discriminated against, harassed, and bullied" was "too vague to constitute protected activity.").

If the employee establishes this prima facie case "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct...." Moore, 461 F.3d at 342 (internal quotations omitted). If the employer does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id.

### 2. Analysis

Plaintiff argues that defendant terminated him in retaliation for engaging in protected activity – namely, various complaints to KidsPeace that he was being discriminated against based on his race. As an initial matter, a number of the complaints alleged by plaintiff are simply not specific enough to notify management of the discrimination at issue. See Sanchez, 2010 WL 318366, at *4. Specifically, the Court rejects plaintiff's argument that the following reports constitute protected activity: (1) plaintiff's casual mention of Pam Peters's January 2006 comment, during conversations

28

focused on different topics, to both Donna Doran and Scott Pompa, absent any formal complaint (Ade Dep. 69-79, 102-105.); (2) plaintiff's written survey of December 2006 in which he stated, in pertinent part, that "people are being biased and others feel unwanted" and that "management need [sic] to address things very vividly across the board and not being [sic] biased" (Def.'s Mot. Ex. KK; Pl.'s Trial Ex. 12.); (3) plaintiff's April 4, 2007 letter, written in response to the disciplinary warning issued to him after the March 22, 2007 Martincavage incident, in which he stated that KidsPeace's decision was "unfair and bias [sic]... since this incident that occurred on March 22, 07 was all about the cats" (Def.'s Mot. Ex. V.); and (4) plaintiff's conversation with Amy Remmel in approximately August 2007, during which he conveyed Doran's comment about Syrian food, and "gave [Remmel] feedback about what happened... telling her things I felt that they should have known," again absent any formal complaint. (Ade Dep. 115-116.)

However, the Court finds that three reports made by plaintiff satisfy the standard for protected activity under the first factor of the prima facie case analysis: (1) plaintiff's complaint to Doran of April 2007, in which he stated that he felt he was being discriminated against based on his race in the context of the Martincavage incident (Ade Dep. 218-219; Ade Aff. ¶ 27.); (2) plaintiff's complaint to Doran during the meeting of November 28, 2007, in which plaintiff told Doran that she was inappropriately drawing conclusions based on Warner's statement, because he was "black," "male," and had an "issue with the cat situation" (Ade Dep. 124-125.); and (3) plaintiff's complaint to Remmel of December 2 or December 3, 2007, in which he stated that "some of the female employees and female supervisors at KidsPeace were discriminating against [him] because of [his] race and gender." (Ade. Aff. ¶ 27.)

Plaintiff next argues that the following two acts of KidsPeace constitute adverse employment

actions under the second factor: (1) KidsPeace's refusal to accommodate his request not to be assigned to work at the Houses where stray cats were being fed, following his April 2007 complaint to Doran, and (2) the termination of his employment several days after his complaints to Doran and Remmel in late November and early December 2007. In order to show a causal connection between the protected activity and the discharge, under the third factor, plaintiff relies heavily on the short period of time which elapsed between plaintiff's complaints of race-based discrimination to Doran and Remmel and these two adverse actions. See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (causal link demonstrated by discharge only two days after notice of plaintiff's EEOC claim was given to defendant).

However, even assuming *arguendo* that plaintiff makes out a prima facie case of retaliation based on the two complaints, plaintiff's claim would nevertheless fail under the third step of the McDonnell Douglas burden shifting framework. For the same reasons stated in the discussion of plaintiff's race and national origin discrimination claims, *supra*, the Court concludes that plaintiff cannot meet his burden to establish that defendant's proffered legitimate reason was a pretext for retaliatory termination. Accordingly, the Court grants defendant's Motion for Summary Judgment on Count V, in which plaintiff asserts a claim of retaliation under Section 1981.

## C. Count III: Breach of Implied Contract/Wrongful Termination Claim

### 1. Legal Standard

The state of Pennsylvania recognizes the at-will employment doctrine. McGovern v. Jack D's, Inc., No. 03-5547, 2004 WL 228667, at *5 (E.D. Pa. Feb. 3, 2004); McLaughlin v. Gastrointestinal Specialists, Inc., 750 A.2d 283, 286 (Pa. 2000). Thus, employment agreements in Pennsylvania are "presumptively terminable at will by either party... an employee may leave a job

for any or no reason and an employer may discharge an employee for any or no cause." Reilly v. Stroehmann Bros., 532 A.2d 1212, 1213 (Pa. Super. Ct. 1987). Notwithstanding the at-will doctrine, an employment agreement may be found where it is implied in fact. "A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings. Offer and acceptance need not be identifiable and the moment of formation need not be pinpointed. 'Implied contracts... arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract.'" Henderson v. Nutrisystem, 634 F. Supp. 2d 521, 535 (E.D. Pa. 2009) (quoting Ingrassia Const. Co. v. Walsh, 486 A.2d 478, 483 (Pa. Super. Ct. 1984)) (internal citations omitted).

Pennsylvania courts also recognize an exception to the doctrine of at-will employment when an employer "terminates an employee for reasons which violate public policy." McGovern, 2004 WL 228667, at *5 (citing Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998)); McLaughlin, 750 A.2d at 287 ("An employee will be entitled to bring a cause of action for [] termination of [an at-will employment] relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth."). The public policy exception is a "narrow one," generally limited to cases where: "(1) an employer requires an employee to commit a crime; (2) an employer prevents an employee from complying with a statutory duty; or (3) the discharge of the employee is specifically prohibited by statute." McGovern, 2004 WL 228667, at *5 (citing Hennessy, 708 A.2d at 1273). In order to succeed on a claim of common law wrongful termination, therefore, a plaintiff "in some way must allege" that his termination implicates, undermines, or violates one such policy. McLaughlin, 750 A.2d at 289. Furthermore, where a cause of action "involves a violation of public policy for which a remedy already exists by

31

statute," Pennsylvania courts have held that "a common law cause of action will not be recognized." McGovern, 2004 WL 228667, at *5 (citing Murray v. Commercial Union Ins. Co., 782 F.2d 432, 437 (3d Cir. 1986) ("Employer actions that discriminate on the basis of age violate public policy, but the PHRA provides the exclusive remedy for this undesirable conduct....")).

### 2. Analysis

Plaintiff's has presented no evidence demonstrating a genuine issue of material fact as to whether KidsPeace breached an implied contract upon his termination. Nothing in the record suggests that plaintiff entered into a specific oral or written employment contract with KidsPeace. Instead, to support his breach of implied contract claim, plaintiff relies on his receipt of an employee handbook, which set forth various employee benefits and duties, at the outset of his employment. However, as the Pennsylvania Superior Court has observed: "A handbook, to be construed as a contract, must contain unequivocal provisions that the employer intended to be bound by it and, in fact, renounced the principle of at-will employment." Reilly, 532 A.2d at 1214. Moreover, the mere furnishing of benefits in an employee handbook does not demonstrate that the "parties reached an agreement or had the intention to contract with respect to those benefits." Henderson, 634 F. Supp. 2d at 536. In this case, the handbook expressly stated that neither the handbook nor any other KidsPeace policy and procedure manual constituted a contract of employment. That the handbook detailed various employee benefits, such as vacation and holiday time, is insufficient to create an implied contract between KidsPeace and plaintiff, particularly in light of its express statements disavowing any contractual obligation. The Court concludes that because there was no "mutual intention to contract," no implied contract was formed, and defendant cannot be liable for breach of any implied contract. Id. at 535.

Plaintiff's claim of wrongful termination under Pennsylvania common law is likewise unsupported. Since PHRA provides the exclusive remedy for unlawful termination based on race and national origin, plaintiff cannot maintain a common law wrongful termination cause of action on that ground. See McGovern, 2004 WL 228667, at *5. Furthermore, plaintiff's claim does not fall into any of the narrow public policy exceptions that have been recognized by the Pennsylvania courts. Instead, plaintiff bases his claim on allegations that he was terminated in violation of KidsPeace's disciplinary policies and that he was not properly compensated for his outstanding vacation and and floating holiday hours. Plaintiff has not provided any authority for the position that termination under these circumstances violates a "clear mandate of public policy" of the Commonwealth, and the Court has found none. See McLaughlin, 750 A.2d at 287.

Accordingly, the Court grants defendant's Motion for Summary Judgment on Count III, in which plaintiff asserts claims of breach of implied contract and wrongful termination.

## V.    CONCLUSION

For the foregoing reasons, the Court grants defendant's Motion for Summary Judgment on all of plaintiff's claims and enters judgment in favor of defendant, KidsPeace Corporation, and against plaintiff, Kunle Ade.

An appropriate order follows.